IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| *Kao Lee Yang,* | § § § | |
| Plaintiff, | § § | |
| *versus* | § § | Civil Action H-18-161 |
| *Cheramie Marine, LLC, et al.* | § § § | |
| Defendants. | § § | |

## DEFENDANT LIGHTERING LLC'S
## MOTION FOR SUMMARY JUDGMENT

Michael K. Bell
717 Texas Avenue, Suite 1400
Houston, Texas 77002
(713) 402-7630
mbell@blankrome.com

*Attorney-in-Charge for Lightering LLC*

# TABLE OF CONTENTS

|     |     |     | Page |
| --- | --- | --- | --- |
| I. | SUMMARY OF MOTION | | 1 |
| II. | FACTS | | 1 |
| III. | ARGUMENT/AUTHORITIES | | 3 |
| | A. | The LHWCA's exclusivity provision (33 U.S.C. § 905(a)). | 3 |
| | B. | Decedents are within the LHWCA's coverage because they were engaged in maritime employment on a wharf or dock adjoining navigable waters of the United States. | 4 |
| | C. | Decedents were Lightering's borrowed employees. | 4 |
| | | 1. *Who had control over the employee and the work he was performing, beyond mere suggestion of details or cooperation?* | 6 |
| | | 2. *Whose work was being performed?* | 8 |
| | | 3. *Was there an agreement, understanding, or meeting of the minds between the original and the borrowing employer?* | 8 |
| | | 4. *Did the employee acquiesce in the new work situation?* | 9 |
| | | 5. *Did the original employer terminate his relationship with the employee?* | 10 |
| | | 6. *Who furnished the tools and place for performance?* | 11 |
| | | 7. *Was the new employment over a considerable length of time?* | 12 |
| | | 8. *Who had the right to discharge the employee?* | 12 |
| | | 9. *Who had the obligation to pay the employee?* | 13 |
| | D. | Plaintiffs' claims against Lightering must be dismissed pursuant to Section 905(a) of the LHWCA. | 13 |
| IV. | CONCLUSION | | 14 |

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*Alday v. Patterson Truck Line, Inc.*,
750 F.2d 375 (5th Cir. 1985) ...................................................................................................5

*Billizon v. Conoco, Inc.*,
993 F.2d 104 (5th Cir. 1993) ...............................................................................................7, 13

*Brown v. Union Oil Co. of Cal.*,
984 F.2d 674 (5th Cir. 1993) .....................................................................................8, 9, 10, 12

*Capps v. N.L. Baroid-NL Indus., Inc.*,
784 F.2d 615 (5th Cir. 1986) ...........................................................................5, 9, 10, 12, 13

*Cheasapeake & Ohio Ry. Co. v. Schwalb*,
493 U.S. 40 (1989) ....................................................................................................................4

*Denton v. Yazoo & M. Valley R. Co.*,
284 U.S. 305 (1932) ..................................................................................................................5

*Garibay v. Decker*,
331 F. Supp. 1093 (S.D. Tex. 1971) .......................................................................................14

*Gaudet v. Exxon*,
562 F.2d 351 (5th Cir. 1977) ....................................................................................................5

*Hall v. Diamond M. Co.*,
732 F.2d 1246 (5th Cir. 1984) ..................................................................................................5

*Hebron v. Union Oil Co. of Ca.*,
634 F.2d 245 (5th Cir. 1981) ...............................................................................................5, 14

*Holcomb v. Robert W. Kirk & Associates, Inc.*,
655 F.2d 589 (5th Cir. 1981) ....................................................................................................4

*Hotard v. Devon Energy Prod. Co. L.P.*,
308 F.App'x 739 (5th Cir. 2009) ............................................................................................10

*In re Natures Way Marine, LLC*,
984 F. Supp. 2d 1231 (S.D. Ala. 2013) ..................................................................................14

*Martin v. Halliburton*,
808 F. Supp. 2d 983 (S.D. Tex. 2011) ....................................................................................14

*McQuagge v. Heil Trailer Intern. Co.*,
602 Fed. Appx. 977, 980 (5th Cir. 2015) .................................................................................6

*Melancon v. Amoco Prod. Co.*,
   834 F.2d 1238 (5th Cir. 1988), *modified on reh'g*, 841 F.2d 572 (5th Cir.
   1988) ...................................................................................................5, 7, 9, 10, 11, 12, 13, 14

*Perron v. Bell Maintenance & Fabricators, Inc.*,
   970 F.2d 1409 (5th Cir. 1992) ...........................................................................................5

*Robin v. Sun Oil Co.*,
   548 F.2d 554 (5th Cir. 1977) ............................................................................................14

*Ruiz v. Shell Oil Co.*,
   413 F.2d 310, 312-313 (5th Cir. 1969) ............................................................................5, 6

*Standard Oil Co. v. Anderson*,
   212 U.S. 215 (1909) ............................................................................................................6

*Thibodeaux v. J. Ray McDermott & Co.*,
   276 F.2d 42 (5th Cir. 1960) ..............................................................................................14

*Total Marine Services, Inc. v. Dir., Office of Worker's Comp. Programs, U.S.
   Dept. of Labor*,
   87 F.3d 774 (5th Cir. 1996) ..............................................................................................14

*Univ. of Texas Med. Branch at Galveston v. United States*,
   557 F.2d 438 (5th Cir. 1977) ..............................................................................................4

*Vlasco v. Amfels, Inc.*,
   368 F. Supp. 2d 656 (S.D.Tex. 2005) ...........................................................................8, 11

*West v. Kerr-McGee Corp.*,
   765 F.2d 526 (5th Cir. 1985) ..............................................................................................5

**Statutes**

33 U.S.C.A. § 902 ........................................................................................................................4

33 U.S.C.A. § 903 ........................................................................................................................4

33 U.S.C. §§ 901, *et seq.* ............................................................................................................1

33 U.S.C. § 905(a) ..................................................................................................1, 3, 4, 6, 13, 14

# I. SUMMARY OF MOTION

Defendant Lightering LLC ("Lightering") files this Motion for Summary Judgment seeking dismissal with prejudice of all claims asserted against it by Plaintiffs Marcus Wilson and Kao Lee Yang, who claim to be the survivors of decedents Blake Carlisle and Tai Vong ("Decedents"), respectively, because:

- Decedents meet the situs and status tests of the Longshore and Harbor Workers Compensation Act, 33 U.S.C. §§ 901, *et seq.*;

- Lightering was Decedents' borrowing employer at the time of the accident at issue; and,

- As Decedents' borrowing employer, Lightering is immune from the Plaintiffs' claims pursuant to the exclusivity provision (33 U.S.C. § 905(a)) of the Longshore and Harbor Workers' Compensation Act.

# II. FACTS

This matter concerns an accident that occurred on September 20, 2017, at T&T Offshore Inc.'s ("T&T") Pelican Island facility in Galveston, Texas. On that day, a T&T employee was operating a T&T-owned crane as part of an operation to load Lightering's equipment onto an offshore supply vessel, the *Elliott Cheramie*, docked at T&T's facility. Moments after the T&T employee began swinging the crane's boom in order to pick up the final piece of equipment, which was on the dock behind the crane, the crane toppled over on its side. When that happened, the crane's boom struck Decedents, who were standing on the T&T dock, killing them instantly.

At the time of the accident, Lightering was utilizing T&T's facility for purposes of supporting Lightering's offshore lightering operations.[1] Generally, this involved Lightering's chartered offshore supply vessels (such as the *Elliott Cheramie*) docking/berthing at the T&T

---

[1] *See* Exhibit A, declaration of Cameron Kehm, Lightering's Director of International Operations, at ¶ 4. Lightering's relationship with T&T is the subject of a declaratory judgment action filed on November 6, 2017, and which is pending before the Honorable Judge Lee Rosenthal as civil action H-17-3374, *Lightering LLC, et al. v. T&T Offshore, Inc., et al.*

1

facility.[2] Depending on circumstances/operational needs, such vessels might be docked for extended periods of time while on standby awaiting orders, or they might be docked only as long as was necessary to load/unload equipment and/or to accomplish periodic crew changes.[3] T&T would, upon request, provide its equipment and/or personnel for purposes of loading and/or unloading Lightering's equipment to/from such vessels.[4] When not in use, Lightering also stored and maintained its lightering equipment at the T&T facility.[5]

Lightering had two individuals permanently assigned to work at the T&T facility: Dock & Facility Superintendent Mario Ruiz, Sr., and Equipment Manager Mario Ruiz, Jr.[6] On the day of the accident, Mario Ruiz Sr., Mario Ruiz Jr., and Decedents were working together to load Lightering's equipment onto the *Elliott Cheramie*.[7] No one else from Lightering was present at the T&T facility at the time of the accident.[8]

Decedents had been assigned to work for Lightering by Express Services, Inc. ("Express"), a staffing company.[9] Providing such personnel to Lightering was Express' only connection to and/or involvement in Lightering's business operations.[10] The relationship between Lightering and Express was governed by a Staffing Agreement whose relevant terms included the following:

> **You [Lightering] <u>supervise</u>, <u>direct</u>, and <u>control</u> the work performed by Express associates, and assume responsibility for all operational results**, including losses or damage to property or data in the care, custody or control of an Express associate.[11]

---

[2] *See* Exhibit A, Kehm declaration, at ¶ 4.
[3] *Id.*
[4] *Id.*
[5] *Id.*
[6] *Id.* at ¶ 7.
[7] *Id.*
[8] *Id.*
[9] *Id.*
[10] *Id.*
[11] *Id.*; and, Exhibit A-1, Staffing Agreement (emphasis added).

2

Other than Decedents, no one from Express was present at the T&T facility prior to the accident.[12] As specified in the Staffing Agreement, Decedents' work at the T&T facility was supervised, directed, and controlled by Lightering personnel.[13] Express had no say in how Decedents performed their work at the T&T facility.[14] Lightering furnished the Decedents with the tools, equipment, and personal protective equipment they needed while working at the T&T facility.[15] Lightering had the right to end Decedents' work for Lightering at any time.[16] Finally, Lightering indirectly paid Decedents' wages via satisfaction of Express' invoices, which were based on timesheets Decedents completed each day they worked for Lightering at the T&T facility.[17]

Two days after the accident, Plaintiff Kao Lee Yang, who claims to be the surviving spouse of Decedent Vong and the mother of their two minor children, filed a wrongful death lawsuit. Shortly thereafter, Plaintiff Marcus Wilson, who claims to be the father of Decedent Carlisle, filed a separate wrongful death lawsuit. Following removal to federal court, the two lawsuits were consolidated before this Court.[18]

### III. ARGUMENT/AUTHORITIES

**A.     The LHWCA's exclusivity provision (33 U.S.C. § 905(a)).**

The Longshore and Harbor Workers' Compensation Act ("LHWCA") is a federal plan for injured workers that parallels the ordinary state workers' compensation statutes. It includes a provision that: "The liability of an employer [under the act] shall be exclusive and in place of all other liability of such employer to the employee . . . and anyone otherwise entitled to recover

---

[12] *See* Exhibit A, Kehm declaration at ¶ 9.
[13] *Id.* at ¶ 8.
[14] *Id.* at ¶ 9.
[15] *Id.* at ¶ 10.
[16] *Id.* at ¶ 12.
[17] *Id.* at ¶ 13.
[18] *See* Doc. No. 19.

3

damages from such employer...." 33 U.S.C. § 905(a).

**B.      Decedents are within the LHWCA's coverage because they were engaged in maritime employment on a wharf or dock adjoining navigable waters of the United States.**

To be covered under the LHWCA, an employee must meet situs and status requirements.[19] Status is met when an individual is engaged in "maritime employment," which specifically includes "any longshoreman or other person engaged in longshoring operations, and any harbor-worker including a ship repairman, shipbuilder, and ship-breaker...."[20] Situs is met when "the disability or death results from an injury occurring upon the navigable waters of the United States (including any adjoining pier, wharf, dry dock, terminal, building way, marine railway, or other adjoining area customarily used by an employer in loading, unloading, repairing, dismantling, or building a vessel)."[21]

On the day of the accident, Decedents were involved in loading equipment onto a vessel docked at T&T's facility on Pelican Island in Galveston, Texas.[22] The T&T facility is located on the Galveston Channel.[23] The Galveston Channel is a navigable waterway of the United States.[24] Decedents are therefore covered by the LHWCA.

**C.      Decedents were Lightering's borrowed employees.**

Section 905(a) of the LHWCA limits the liability of an "employer." The term "employer" has been interpreted to encompass both general employers and employers who "borrow" a servant from a general employer, and statutory LHWCA benefits are the exclusive remedies against both

---

[19] *Cheasapeake & Ohio Ry. Co. v. Schwalb*, 493 U.S. 40 (1989).
[20] 33 U.S.C.A. § 902; *also see Holcomb v. Robert W. Kirk & Associates, Inc.*, 655 F.2d 589, 592 (5th Cir. 1981) ("an injured worker is a covered 'employee' if at the time of his injury (a) he was performing the work of loading, unloading, repairing, building, or breaking a vessel, or (b) although he was not actually carrying out these specified functions, he was 'directly involved' in such work.").
[21] 33 U.S.C.A. § 903.
[22] *See* Exhibit A, Kehm declaration, at ¶ 6.
[23] *See* Exhibit B, map accessed via link on T&T Offshore's website, http://teichmangroup.com/index.html#contact, on April 11, 2018, and NOAA chart 11324 (full view and excerpt focusing on area of T&T facility).
[24] *See, e.g., Univ. of Texas Med. Branch at Galveston v. United States*, 557 F.2d 438 (5th Cir. 1977).

4

the general and the borrowing employer.[25]

In *Denton v. Yazoo & M. Valley R. Co.*, the United States Supreme Court defined borrowed servant as follows:

> When one person puts his servant at the disposal and under the control of another for the performance of a particular service to the latter, the servant, in respect of his acts in that service, is to be dealt with as the servant of the latter and not the former.[26]

In *Ruiz v. Shell Oil Co.* the Fifth Circuit identified nine factors to be used in determining whether an employee can be considered a borrowed employee of another entity.[27] The factors to be considered include:

(1) Who had control over the employee and the work he was performing, beyond mere suggestion of details or cooperation?
(2) Whose work was being performed?
(3) Was there an agreement, understanding, or meeting of the minds between the original and the borrowing employer?
(4) Did the employee acquiesce in the new work situation?
(5) Did the original employer terminate his relationship with the employee?
(6) Who furnished the tools and place for performance?
(7) Was the new employment over a considerable length of time?
(8) Who had the right to discharge the employee?
(9) Who had the obligation to pay the employee?[28]

Further, "[w]hile the courts do not use a fixed test and do not decide the issue based on one factor, the courts place the most emphasis on the first factor, control over the employee."[29]

---

[25] *See Perron v. Bell Maintenance & Fabricators, Inc.*, 970 F.2d 1409 (5th Cir. 1992).
[26] *See Denton v. Yazoo & M. Valley R. Co.*, 284 U.S. 305, 308 (1932).
[27] 413 F.2d 310, 312-313 (5th Cir. 1969).
[28] *Melancon v. Amoco Prod. Co.*, 834 F.2d 1238, 1244 (5th Cir. 1988), *modified on reh'g*, 841 F.2d 572 (5th Cir. 1988) (*citing Ruiz*, 413 F.2d at 312-313); *see also West v. Kerr-McGee Corp.*, 765 F.2d 526, 530 (5th Cir. 1985); *Alday v. Patterson Truck Line, Inc.*, 750 F.2d 375, 376 (5th Cir. 1985); *Hall v. Diamond M. Co.*, 732 F.2d 1246, 1249 (5th Cir. 1984); *Gaudet v. Exxon*, 562 F.2d 351, 355 (5th Cir. 1977)).
[29] *Capps v. N.L. Baroid-NL Indus., Inc.*, 784 F.2d 615, 617 (5th Cir. 1986) (*citing Ruiz*, 413 F.2d at 312); *Hebron v. Union Oil Co. of Ca.*, 634 F.2d 245, 247 (5th Cir. 1981).

As shown below, the evidence establishes that as of the time of the accident, Decedents were Lightering's borrowed employees, and Lightering is therefore entitled to the protections of Section 905(a).

1.   *Who had control over the employee and the work he was performing, beyond mere suggestion of details or cooperation?*

Although no single factor or combination of factors is dispositive, the Fifth Circuit "has considered the first factor – control – to be the central factor."[30] This factor requires the Court to distinguish "between authoritative direction and control, and mere suggestion as to details or the necessary cooperation, where the work furnished is part of a larger undertaking."[31]

The evidence establishes that Lightering had authoritative direction and control over Decedents in their day-to-day work operations. All of Carlisle and Vong's work at the T&T facility was supervised, directed, and controlled by Lightering personnel, in particular, Mario Ruiz, Sr., and, to the extent necessary, Mario Ruiz, Jr.[32] This included assigning all work tasks to Carlisle and Vong, and then supervising and monitoring the assigned work while it was in progress through to completion.[33]

Further, other than Carlisle and Vong, no one from Express was present at the T&T facility on September 20, 2017 before the accident occurred.[34] There were never any Express supervisors/managers present during Carlisle and Vong's work for Lightering, including on the day of the accident.[35] No one from Express gave Carlisle and Vong any instructions or directions

---

[30] *McQuagge v. Heil Trailer Intern. Co.*, 602 Fed. Appx. 977, 980 (5th Cir. 2015).
[31] *Ruiz*, 413 F.2d at 313 (internal quotation marks omitted) (quoting *Standard Oil Co. v. Anderson*, 212 U.S. 215, 222 (1909)).
[32] *See* Exhibit A, Kehm declaration, at ¶ 8.
[33] *Id.*
[34] *Id.* at ¶ 9.
[35] *Id.*

6

regarding their work for Lightering at the T&T facility.[36] All such instructions/direction came from Lightering.[37]

Under the applicable case law, the foregoing evidence is sufficient to establish borrowed servant status. For example, in *Melancon v. Amoco Production Co.*, the Fifth Circuit affirmed the district court's finding, among others, that the control factor weighed in favor of borrowed employee status.[38] In particular, the Fifth Circuit concluded that Amoco, the alleged borrowing employer, "clearly had control" over the plaintiff because he "took orders" from Amoco personnel "who told him what work to do, and when and where to do it."[39] The Fifth Circuit further explained that the lending employer in *Melancon* "gave no instructions" to the plaintiff "except to go to the Amoco field and perform the work requested by Amoco personnel."[40]

Similarly, in *Billizon v. Conoco, Inc.*, the Fifth Circuit affirmed the district court's finding that the control factor weighed in favor of borrowed employee status.[41] In support, the Fifth Circuit explained that the plaintiff was regularly supervised by an employee of Conoco, the alleged borrowing employer.[42] Moreover, the plaintiff attended "daily tailgate meetings" conducted by Conoco personnel to "discuss safety and work-related issues."[43] The Fifth Circuit in *Billizon* also noted that no supervisors from the plaintiff's lending employer were in the field to oversee his work.[44]

---

[36] *Id.*
[37] *Id.*
[38] *Melancon v. Amoco Prod. Co.*, 834 F.2d 1238, 1244-45 (5th Cir. 1988), *amended on reh'g in part sub nom. Melancon v. Amoco Productions Co.*, 841 F.2d 572 (5th Cir. 1988).
[39] *Id.* at 1245.
[40] *Id.*
[41] *Billizon v. Conoco, Inc.*, 993 F.2d 104, 105 (5th Cir. 1993).
[42] *Id.*
[43] *Id.*
[44] *Id.*

7

Finally, this Court granted summary judgment in favor of the borrowing employer in *Vlasco v. Amfels, Inc.*, finding that there was no indication that A.D. Welding (the lending employer) had any say in how the plaintiff performed his duties at the Amfels (the alleged borrowing employer) shipyard or when they were performed.[45] As in the instant case, the plaintiff's work for Amfels was subject to a staffing agreement between Amfels and A.D. Welding wherein Amfels retained the right to "[s]upervise all personnel in the work being performed and controlling the details of the work performed and the manner in which the work will be performed ...."[46] Based on the foregoing, in combination with evidence establishing that the plaintiff's supervisors were in fact Amfels employees, the Court ruled that "the first factor points in favor of borrowed employee status...."[47]

In light of the evidence and case law detailed above, Lightering had authoritative control over Decedents. Accordingly, this factor supports a finding of borrowed servant status.

### 2. *Whose work was being performed?*

There is no question that all of Decedents' work at the T&T facility was Lightering's work, performed at the sole direction of Lightering.[48] Thus, this factor supports a finding that Decedents were borrowed servants of Lightering.

### 3. *Was there an agreement, understanding, or meeting of the minds between the original and the borrowing employer?*

In deciding this factor, courts have looked to contractual provisions and the behavior of the parties to determine whether an understanding existed.[49] In this case, Lightering and Express executed a Staffing Agreement on January 6, 2017, pursuant to which Express supplied Decedents

---

[45] *Vlasco v. Amfels, Inc.*, 368 F.Supp.2d 656 (S.D. Tex. 2005).
[46] *Id.* at 659.
[47] *Id.*
[48] *See* Exhibit A, Kehm declaration.
[49] *Brown v. Union Oil Co. of California*, 984 F.2d 674, 678 (5th Cir. 1993).

8

to perform Lightering's work at T&T's facility.[50] The Staffing Agreement expressly provides that Lightering is responsible for supervising, directing, and controlling the work performed by Express personnel.[51] Based on the Staffing Agreement and its provisions alone, this factor weighs in favor of borrowed servant status.

4.  *Did the employee acquiesce in the new work situation?*

The focus for this factor is not whether the employee acquiesced in his assignment to the borrowing employer; rather, the focus is whether "the employee was aware of his work conditions [at the borrowing employer's facility] and chose to continue working in them."[52]

In *Capps v. N.L. Baroid-NL Indus., Inc.*, the Fifth Circuit found that Capps "acquiesced in the new work situation" even though he was injured at Baroid's [borrowing employer's] facility on his first day of working there, because Capps "worked for a company that loaned temporary employees."[53] Thus, Capps knew that Davis and Sons, the lending employer, would send him into new work situations, and he "acquiesced to the fact that Davis would constantly send him into new work situations."[54]

The Decedents, like the employee in *Capps*, were provided by a staffing company/temp agency to Lightering (i.e., the borrowing employer) for the purpose of performing Lightering's work at the T&T facility. The Decedents knew what the work conditions would be when they began working for Lightering at the T&T facility, and made no complaints regarding these conditions.[55] This factor, therefore, weighs in favor of borrowed servant status.[56]

---

[50] *See* Exhibit A, Kehm declaration, at ¶ 7; and, Exhibit A-1, Staffing Agreement.
[51] *Id.*
[52] *Brown*, 984 F.2d at 678.
[53] *Capps*, 784 F.2d at 617.
[54] *Id.*
[55] *See* Exhibit A, Kehm declaration.
[56] *See Melancon*, 834 F.2d at 1246 ("[Melancon] knew when he began to work on Amoco's offshore platforms in 1977 what his work conditions would be, and he made no complaint regarding these conditions to Beraud [lending employer] or to Amoco [borrowing employer].").

9

### 5. *Did the original employer terminate his relationship with the employee?*

When considering this factor, the focus is "on the lending employer's relationship with the employee while the borrowing occurs."[57] This factor "does not require a lending employer to completely sever its relationship with the employee, because such a requirement would effectively eliminate the 'borrowed employee' doctrine."[58] The Fifth Circuit considers whether the original employer exercised control over the employee while he worked for the borrowing employer, whether the original employer placed restrictions on the borrowing employer regarding the employee's employment conditions, and whether the original employer could remove the employee from the job with the borrowing employer if the employee was needed elsewhere.[59]

In *Capps*, the Fifth Circuit found that where the lending employer "exercised no control" over the employee while he worked for the borrowing employer and "placed no restrictions" on the employee's employment with the borrowing employer, the lending employer effectively terminated its relationship with the employee, which weighed in favor of borrowed servant status.[60]

The Fifth Circuit later decided *Hotard v. Devon Energy Production Co. L.P.*,[61] affirming summary judgment in favor of Devon (the borrowing employer) on the grounds that Plaintiff was Devon's "borrowed employee," reasoning that the fact that Plaintiff (the employee) had no contact with Wood Group (his lending employer) and was supervised totally by Devon (his borrowing employer's) employees while on the platform is sufficient to meet the fifth factor.[62]

Express' control over Decedents was non-existent while they worked for Lightering at the T&T facility. Express did not direct or supervise Decedents' actions while they performed

---

[57] *Brown*, 984 F.2d at 678; *Melancon*, 834 F.2d at 1246; and *Capps*, 784 F.2d 615, 617-618.
[58] *Melancon*, 834 F.2d at 1246; *Capps*, 784 F.2d at 617.
[59] *Brown*, 984 F.2d at 679; *Capps*, 784 F.2d at 618.
[60] *Capps*, 784 F.2d 615, 617-618.
[61] *Hotard v. Devon Energy Prod. Co. L.P.*, 308 F.App'x 739 (5th Cir. 2009).
[62] *Id.* at 742 (citing *Melancon*, 834 F.2d at 1246).

Lightering's work at the T&T facility, and there is no evidence that Express placed conditions or restrictions on Lightering's use of Decedents at the T&T facility.[63] While Decedents performed Lightering's work, Express had "temporarily terminated its relationship" with and had "nominal" control over Decedents.[64] From these facts, and in light of the Fifth Circuit decisions referenced above, it is clear that this factor supports a finding of borrowed servant status.

### 6.  *Who furnished the tools and place for performance?*

Lightering furnished Carlisle and Vong with the tools, equipment, and personal protective equipment they needed while working for Lightering at the T&T facility.[65] Further, Lightering provided Decedents with the place of performance.

Moreover, even if the original employer or the employee himself provides some of the equipment used while working at the borrowing employer's facility, this does not preclude a finding in favor of borrowed employee status.[66] In *Melancon v. Amoco Production Co.*, the Fifth Circuit held that, although the payroll employer provided a welding machine and related equipment, Amoco [borrowing employer] provided consumables, transportation, food, lodging, and place of performance, and, thus, "the balance on this factor was in Amoco's favor."[67] Furthermore, this Court found in *Velasco v. Amfels, Inc.*, that "The fact that Plaintiff provided much of his own personal work gear does not indicate that he was not the borrowed employee of Amfels [the alleged borrowing employer]."[68]

For the foregoing reasons, this factor supports a finding of borrowed servant status in the instant case.

---

[63] *See* Exhibit A, Kehm declaration, at ¶ 9.
[64] *Melancon*, 834 F.2d at 1246.
[65] *See* Exhibit A, Kehm declaration, at ¶ 10.
[66] *Melancon*, 834 F.2d 1238, 1246.
[67] *See Id.*
[68] *Velasco v. Amfels, Inc.*, 368 F.Supp.2d at 660.

11

### 7. *Was the new employment over a considerable length of time?*

Decedent Carlisle worked at the T&T facility for approximately two weeks prior to the accident, and Decedent Vong worked there for two days.[69] In *Capps*, the Fifth Circuit noted that "where the length of employment is considerable, this factor supports a finding that the employee is a borrowed employee; however, the converse is *not* true."[70] There, Capps' injury occurred on his first day of work, and the Fifth Circuit concluded that this seventh factor was neutral.[71] The Fifth Circuit drew the same conclusion in *Brown v. Union Oil*, wherein it found that when a short period of time is alleged that this factor is neutral.[72] Here, as in *Capps* and *Brown*, the Decedents did not work at the T&T facility for an extended period of time prior to the accident. Thus, this factor is neutral on borrowed employee status.

### 8. *Who had the right to discharge the employee?*

The focus of this inquiry is not whether the borrowing employer could discharge the employee from his employment with the original employer, but whether the borrowing employer "had the right to terminate [the employee's] service with itself."[73] In *Brown v. Union Oil*, the Fifth Circuit held that "Although Union [borrowing employer] did not have the right to terminate Brown's employment with Gulf Island, it had the right to terminate Brown's work relationship with Union."[74] This arrangement is sufficient to support a finding of borrowed servant status."[75] Further, the Fifth Circuit found in *Melancon v. Amoco Prod. Co.*, that "Amoco [borrowing employer] also has the right to discharge Melancon even though Amoco could not terminate

---

[69] *See* Exhibit A, Kehm declaration, at ¶ 13; and, Exhibit A-2, Invoices and Timesheets for Carlisle and Vong.
[70] *Capps*, 784 F.2d at 618 (emphasis added).
[71] *Id.*
[72] *Brown*, 984 F.2d at 679.
[73] *Capps*, 784 F.2d at 618; *see also Brown*, 984 F.2d at 679.
[74] *Brown*, 984 F.2d at 679.
[75] *Id.*

Melancon's employment with Beraud."[76] Amoco's right to terminate Melancon's services in the Amoco field satisfied this requirement.[77]

Here, Lightering could end Decedents' work for Lightering at any time.[78] Therefore, this factor weighs in favor of borrowed servant status.

### 9. *Who had the obligation to pay the employee?*

The focus under this factor is not on which entity physically paid the employee, but rather which entity furnished the funds from which the employee was paid.[79] Here, Lightering paid Express the funds that were used to pay those individuals (i.e., Decedents) that were assigned to Lightering.[80] Lightering payments were based on the number of hours that Decedents worked each day for Lightering at T&T's facility, as verified by time cards signed and approved by Mario Ruiz, Sr., and then submitted to Express.[81] If Mario Ruiz, Sr. did not verify Decedents' time cards, they would not get paid for their work on that day.[82] Because Lightering furnished the funds from which Express paid Decedents, this factor weighs in favor of borrowed employee status.

### D. Plaintiffs' claims against Lightering must be dismissed pursuant to Section 905(a) of the LHWCA.

The evidence establishes that Lightering was Decedents' borrowing employer. As such, the LHWCA provides Plaintiffs' exclusive and sole remedy against Lightering, and Section 905(a)

---

[76] *Melancon*, 834 F.2d at 1246.
[77] *Id.*
[78] Exhibit A, Kehm declaration, at ¶ 12.
[79] *See, e.g., Billizon*, 993 F.2d at 105 (noting that, while the borrowed servant was paid by the lending employer, his pay was based on time tickets verified by the borrowing employer, and determining that this factor did not support the borrowing employer's contention that the servant was not borrowed); *Melancon*, 834 F.2d at 1246 (finding that, when the borrowing employer paid the servant's wages "via" the lending employer based on the number of hours the servant worked for the borrowing employer, the fact that the lending employer "kept a percentage of the amount [the borrowing employer] was charged is not relevant" because the borrowing employer "furnished the funds from which" the lending employer paid the servant); *Capps*, 784 F.2d at 618 (finding, when the lending employer had the obligation to pay the borrowed servant but it received the funds to do so from the borrowing employer, that this factor did "not detract from the district court's ruling" that the employee was a borrowed servant).
[80] *See* Exhibit A, Kehm declaration, at ¶ 13.
[81] *See Id.*
[82] *See Id.*

bars the wrongful death and survival tort causes of action Plaintiffs have asserted against Lightering.[83][84] Therefore, those claims must be dismissed in their entirety with prejudice.

## IV. <u>CONCLUSION</u>

Based on the foregoing, Lightering requests that the Court enter summary judgment in favor of Lightering and dismiss with prejudice all of Plaintiffs' claims against Lightering, and for any other relief to which Lightering may be entitled.

---

[83] *Hebron*, 634 F.2d at 247–48 ("Having determined that Hebron was the employee of Union Oil, he is thus covered by the LHWCA, entitling him to workmen's compensation under the act. Workmen's compensation under the LHWCA is an exclusive remedy for an employee, and the Act bars all common law damages against an employer."); *Robin v. Sun Oil Co.*, 548 F.2d 554, 556 (5th Cir. 1977) ("Teledyne was the employer of the decedent. Teledyne's exclusive liability to the plaintiff was under the Longshoremen's and Harbor Workers' Compensation Act, 33 U.S.C.A. s 905. Teledyne could not have any "liability in damages to the plaintiff" for negligence because Section 5 of the Longshoremen's and Harbor Workers' Compensation Act destroys any underlying tort liability of the employer. In the words of this Court, "(T)here simply exists no underlying tort liability upon which to base a claim against the employer."); *see also Garibay v. Decker*, 331 F. Supp. 1093, 1094 (S.D. Tex. 1971) (holding that in contrast to Texas state workers' compensation statute, LHWCA does not provide an exception in death cases for allegations of gross negligence.).

[84] Lightering, which does have LHWCA insurance coverage (*see* Exhibit C, Certificate of Insurance), is unaware of any of the Plaintiffs having ever filed claims for LHWCA survivor benefits. However, whether or not Plaintiffs have done so has no effect on Lightering's ability to rely on the protections of Section 905(a). *See Thibodeaux v. J. Ray McDermott & Co.*, 276 F.2d 42, 46 (5th Cir. 1960); *Martin v. Halliburton*, 808 F. Supp. 2d 983, 990 (S.D. Tex. 2011) ("Under the Longshore Act, an employer has secured payment of compensation if the employer obtained insurance on the payment of compensation or furnished proof that the employer was financially capable of paying such compensation directly."); and, *In re Natures Way Marine, LLC*, 984 F. Supp. 2d 1231, 1243 (S.D. Ala. 2013) ("The LHWCA provides that the employer must secure payment of compensation, and binding case law explains this as the long-range method whereby the employer satisfies the Department of Labor that it can, that is, it has the potential, to pay compensation payments when/if required to do so under the Act. The LHWCA does not place any additional burden on the employer to immediately and actually make compensation payments to individual injured employees. In other words, Flexicrew must 'secure' payment, not actually make payment of benefits." Moreover, even in the event that an entity other than Lightering, such as Express or its LHWCA insurer, has paid or pays any survivor benefits, Lightering, as Decedents' borrowing employer, would still be entitled to the protections of Section 905(a). *See, e.g., Total Marine Services, Inc. v. Dir., Office of Worker's Comp. Programs, U.S. Dept. of Labor*, 87 F.3d 774, 776 (5th Cir. 1996); and, *Melancon*, 834 F.2d 1238.

Respectfully submitted,

**BLANK ROME LLP**

*/s/ Michael K. Bell*
Michael K. Bell
State Bar No. 02081200
Federal Bar No. 5085
717 Texas Avenue, Suite 1400
Houston, Texas 77002
Telephone: (713) 402-7630
Facsimile: (713) 228-6605
Email: mbell@blankrome.com
**ATTORNEY-IN-CHARGE FOR LIGHTERING LLC**

**OF COUNSEL:**

**BLANK ROME LLP**
David Meyer
State Bar No. 24052106
Federal I.D. No. 732583
Email: dmeyer@blankrome.com

# CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing instrument was served pursuant to Rule 5 of the Federal Rules of Civil Procedure on all counsel of record on this the 18th day of April, 2018.

*/s/ David G. Meyer*
David G. Meyer